# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KENNETH ERNEST ABEND

v.

WARDEN, NORTH BRANCH
CORRECTIONAL INSTITUTION-
CUMBERLAND

Case No. RDB-10-2370

\* \* \* \* \* \*

## MEMORANDUM OPINION

Kenneth Ernest Abend ("Petitioner" or "Abend") filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on August 26, 2010, challenging his convictions in the Circuit Court of Anne Arundel County, Maryland. (ECF No.1). On November 3, 2004, Abend pled not guilty with an agreed statement of facts to charges including capital murder, first-degree sex offense, and felonious use of a handgun in a violent crime. He was subsequently convicted of all charges and sentenced to multiple consecutive terms of life in prison.

In his § 2254 petition, Abend challenges his convictions on eleven separate grounds. First, he raises the four issues that he raised on direct appeal in state court: (1) that he was denied the opportunity to present a closing argument; (2) that the court erroneously denied his motion for DNA evidence; (3) that his waiver of a jury trial was invalid; and (4) that he was not provided proper written notice of the State's intention to seek enhanced penalties. Abend also contends that he received ineffective assistance of counsel on seven different grounds: (1) that trial counsel failed to vigorously litigate their client's lack of criminal responsibility or an insanity defense; (2) that trial counsel failed to use a defense of intoxication; (3) that trial counsel failed to use charts that had been prepared for sentencing; (4) that one of the trial attorneys had a conflict of interest because of prior representation of "Big Frank" Nichter; (5) that trial counsel

used an investigator who had previously dated "Big Frank" Nichter; (6) that trial counsel failed to zealously defend the case, as evidenced by numerous continuances; and (7) that the cumulative effect of the errors resulted in ineffective assistance of counsel. The State filed an answer to Abend's habeas corpus petition (ECF No. 9). The issues pertaining to this motion have been fully briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons set forth below, the Petition for Writ of Habeas Corpus will be denied.

## BACKGROUND

On January 14, 2002, the bodies of Laverne Mae Browning and her daughter-in-law, Tamie Christine Browning, were found in the trunk of Tamie Browning's car. Exh. 18 at 1.[1] Abend was charged in the Circuit Court for Anne Arundel County with those murders and related offenses. The State noticed an intent to seek enhanced penalties, including the death penalty and life imprisonment without possibility of parole.

On September 22, 2004, Abend opted to proceed to trial by way of an agreed statement of facts. *See* Exh. 2. That agreed statement of facts, omitting any questions or comments by the trial court and correcting some minor typographical errors, reads as follows:

> The events in this case began on January 12, 2002, at 225 Margate Drive, in Glen Burnie, Anne Arundel County, Maryland. The 225 Margate Drive address was a single family residence owned by Laverne May Browning at the time. At this time the Defendant, Kenneth Ernest Abend, rented the basement portion of the Margate Drive residence from Laverne Browning. Access to the Defendant's living area was from the rear of the dwelling through a sliding glass door in the area of the rear screened-in porch. Entrance to the upper level where Laverne Browning lived was from the front door. There was an interior door on the lower level that Laverne Browning kept locked to separate Mr. Abend's living area from the rest of the house.

> Randy Browning, who is the son of Laverne Browning and is married to Tamie Browning, would testify to the following: That he and his wife had known

---

[1] References to Exhibits refer to the exhibits attached to the State's Answer to Petition for Writ of Habeas Corpus.

the Defendant for a lengthy period of time. He would further testify he last saw his mother, Laverne, on January 12, 2002 at her house around 3:30 p.m. He would further state that his wife, Tamie Browning, left their home on Stephens Road in Anne Arundel County on January 12, 2002 at 8:00 p.m. to go to Abend's residence to party because it was her birthday. Randy did not go.

Later Randy drove to the Defendant's residence at about 9:00 p.m. on January 12, 2002. His wife's 1991 white Oldsmobile Cutlass was there. The Defendant was standing outside. He told Randy that Tamie was there, but she had become angry and left with Joseph Lloyd, a friend. Randy then went home to wait for Tamie['s] call, but she never called and never returned home. On January 13th, 2002 Randy drove by the Defendant's residence at about 10:00 a.m., and his wife's car was gone. Randy would also testify that the Defendant previously told him that he owned a .38 caliber gun.

On January 14th, 2002, at 8:00 a.m., Randy was told by his friend, Frank Barracoto, that Randy's mother, Laverne, had been the victim of a shooting at her home. Randy arrived at his mother's home at about 9:00 a.m. He found the rear door of the home unsecured and observed a large pool of blood on the floor of Mr. Abend's apartment. He later called the police from his home.

Officer Light, of the Anne Arundel County Police, arrived at the 225 Margate Drive residence on January 14th, 2002 at about 9:45 a.m. Officer Light checked the residence for victims. He approached the house from the carport area and observed what appeared to be dried blood inside the screened-in porch leading to the entrance to Mr. Abend's residence. It appeared that something or someone had been dragged through the blood. Officer Light also observed several bloody footwear impressions in the same area.

When he entered Mr. Abend's apartment through the sliding glass door, he observed dried blood on the floor of the kitchen area and what appeared to be bloody drag marks leading from the kitchen floor to the rear sliding glass door. No victims were found in the lower level. Officer Light then proceeded to the upper level of the home through a door that separated the lower level of the apartment from the rest of the home. The door was open, although Laverne Browning's practice was to keep it locked. Officer Light observed dried blood on the steps leading from the lower level to the foyer area. The upper level was checked and no victims or obvious signs of blood were found. Officer Light exited through the rear sliding glass door and observed five shell casings on the floor adjacent to the kitchen area. The casings were found to be .38 caliber special rounds.

On January 13th, 2002, just after midnight, a white male with short of balding hair, stocky build, with a fat face fitting Abend's general description checked into the Bell Alton Hotel in Charles County, Maryland. This person

3

registered in the name of John Redmond, with an address of Gambrills, Maryland. The person was given room number six.

At 7:30 a.m. on January 14th, 2002 a dog was heard barking in room number six. At 11:15 a.m., it was discovered that the dog had been abandoned. This dog was identified as belonging to Mr. Abend, and his name was Allen.

On Sunday, January 27th, 2002, Karen Dungan, the Defendant's sister, presented photo identification and attempted to pick the dog up. She would testify that she learned from Mr. Abend's attorney that the dog was left in a motel in southern Maryland. Custody of the dog was eventually turned over to Mr. Abend's immediate family.

On January 12th, 2002, Karen Colauer and Nancy Chenowith went to Abend's residence at 225 Margate Drive some time after 9:00 p.m. When they arrived, they observed a white car parked under the carport, a tan colored van and Laverne Browning's black Monte Carlo also parked in the driveway. Mr. Abend was kneeling outside the front screen door going to the porch. Karen Colauer would testify that Mr. Abend was sitting there looking like he was drunk because he was slouching. Nancy Chenowith would testify that Mr. Abend appeared a little spaced out, nervous, dazed and confused. She would further testify that because of his head injury six months earlier he always seemed a little slow from it. Abend asked, what are you guys doing here? I've got a couple of girls in the house. I ain't going nowhere. You got to leave. He then said, get me a hot chocolate and come back in half an hour.

They left and returned with his drink in a 7-11 cup. When they returned, the black Monte Carlo and white car were still sitting there. Mr. Abend was on the steps inside the screen door wearing a grayish-white work jacket with what appeared to be red splash on the front of the jacket. It appeared he had wiped his hands on it. They asked if he was painting, and he said yeah. They did not smell paint. They followed him into his residence. They saw something red on the floor and asked him if it was jam. He then threw clothes and cardboard on top of the red area on the floor. Karen Colauer got some of the red substance they were referring to on her Reebok athletic shoes while she was in Mr. Abend's residence. She later turned her shoes over to the Anne Arundel County Police. Karen Colauer and Nancy Chenowith would both testify that during these visits they were able to ask Mr. Abend questions and his responses were intelligible to them.

On January 13th, 2002, Hector Silva, a friend of the Defendant, returned to his home at 3706 Second Street in Baltimore City, shortly after 7:00 p.m. He would testify that when he arrived home, Kenneth Abend had entered his home without his permission. He said to Abend, what are you doing in my house? Abend said, I needed to hide out. I need a ride to the Greyhound. Further into the conversation Silva said, before I take you anywhere, you have to tell me what happened. Abend replied, I did something bad. Then Abend said, I shot my

4

landlord. He then said he was going to turn himself in. At about 10:00 p.m. Silva called the police. Hector Silva would further testify that when the police officer arrested Mr. Abend, he appeared messed up and you could tell he was smoking greens. He's bad with PCP. He's always messed up.

Officer Popp, of the Baltimore City Police, arrived and Mr. Abend was placed under arrest for burglary. Officer Popp would testify that Mr. Abend appeared disoriented at the time of his arrest. Hector Silva would further testify that on a previous occasion he saw Abend with a handgun, which was black and looked like an old time revolver.

Jennifer Crietz would testify that she has seen Mr. Abend with a black handgun in the past. Carey Green would testify that he knew Mr. Abend owned a pistol.

Incident to Mr. Abend's arrest in Baltimore City for burglary, a green polo style shirt and blue jeans he was wearing were seized. What appeared to be blood was observed on the front of these items. They were ultimately turned over to the Anne Arundel County Police. The jacket worn by Mr. Abend and left at Hector Silva's home was also seized. A Mass Transit Light Rail ticket dated January 13th, 2002 was found in Mr. Abend's jacket pocket.

Detective Hossenfuss went to Baltimore City to meet with Mr. Abend and retrieve his clothing. Detective Hossenfuss went into the holding room. The detective asked Mr. Abend if he could see the bottom of his shoes. Mr. Abend complied. Detective Hossenfuss recognized the pattern on the sole of the shoe to be similar to one of the blood footwear impressions he observed at 225 Margate Drive. Mr. Abend's shoes were then seized.

On January 14th, 2002, at 10:20 p.m., Tamie Browning's white Oldsmobile Cutlass was found in the parking lot of 7381 Ridge Water Court in Glen Burnie. This location is approximately one half mile from Mr. Abend's residence. There was what appeared to be a bloody palm print on the top of the trunk near the left rear fender. This palm print was lifted from this area of the car. A swab was also taken from the same area of the trunk. Blood was also pooling under the trunk area. The trunk was opened, and the partially clothed bodies of Tamie Browning and Laverne Browning were located inside. A search warrant was obtained and evidence was collected and processed.

On January 30th, 2002, at about 12:00 p.m., the 2000 black Chevrolet Monte Carlo registered to Laverne Browning was located in a parking garage located at 221 West Lombard Street in Baltimore City. The vehicle was locked. The vehicle was towed to Anne Arundel County to be processed. Processing the Monte Carlo owned by Laverne Browning revealed a blood stain on the passenger seat, one Smith & Wesson .38 caliber revolver Blue Steel loaded with six federal .38 caliber cartridges was recovered. Three of the rounds had been fired. One

live round with a dented primer and two live rounds had not been fired. Also found in the vehicle, in the open storage area of the center console, was a partially smoked Newport cigarette.

As a result of the execution of a search warrant on the Defendant's residence, located at 225 Margate Drive, the following items were seized: One projectile recovered from the sliding glass door track, five spent cartridge cases recovered from the Defendant's living room carpet, three spent cartridge cases recovered from the Defendant's kitchen drawer, one spent cartridge case, one spent bullet recovered from the bathroom floor of the Defendant's bathroom, one blood white jacket in the Defendant's living room, Tamie Browning's purse, wallet and identification, one eyeglass lens on the Defendant's living room floor, one 7-11 coffee cup, Café Select, one wooden dowel on the Defendant's living room floor, Men's right Adidas shoe in the center of the Defendant's living room. A jacket with a small bottle containing a quantity of suspected PCP in the right front pocket was also found in the Defendant's living room.

At autopsy two spent bullets were recovered from the body of Laverne Browning. Two spent bullets and spent bullet fragments were recovered from Tamie Browning's body. Dr. Ripple, of the Medical Examiner's Office, autopsied Laverne Browning's body on January 15th, 2002. She determined, to a reasonable degree of medical certainty, the cause of death to be two gunshot wounds to the torso and blunt force injuries. One gunshot wound was to the right side of the abdomen. A Copper jacketed bullet was recovered from the heart. The second gunshot wound was to the right side of the lower back. A copper jacketed bullet was recovered from the abdominal cavity.

The blunt force injuries were to Laverne Browning's head and neck and resulted in fractures of the cervical vertebrae four to five, with associated hemorrhaging and softening of the spinal cord. There were also multiple cutaneous abrasions and contusions of the head, with focal underlying subgaleal hemorrhage. The injuries to her head and neck were consistent with a struggle or falling down the steps after being shot. There were also multiple cutaneous abrasions and contusions to the torso and extremities. Dr. Ripple would further testify that the manner of death was homicide.

The body of Tamie Browning was also autopsied by Dr. Ripple on January 15th, 2002. She would testify, to a reasonable degree of medical certainty, that the cause of death was multiple gunshot wounds and blunt force injuries. Dr. Ripple identified four gunshot wounds. Each one had the potential to be fatal in and of itself. One gunshot wound was to the back of the left side of the head, with pseudo stippling surrounding the wound. A deformed copper jacketed bullet was recovered from the right shoulder. A second gunshot wound was to the front of the upper abdomen. This wound had evidence of close range firing. A third gunshot wound was to the lower left side of the abdomen. A deformed copper jacketed bullet was recovered from the right side of the

6

abdomen. The fourth gunshot wound was to the left side of the cervix. Dr. Ripple found soot on the surrounding cervical mucosa and within the wound track. This is evidence of close range firing in the area of the cervix. Dr. Ripple would testify, to a reasonable degree of medical certainty, that based on the presence of blood in the vaginal vault and hemorrhage along the entire wound track, she concluded that Tamie Browning was alive when this contact wound to the cervix was inflicted. In addition, the barrel of the gun was in contact with the cervix, indicating penetration of the vagina with the gun.

The blunt force to Tamie Browning were as follows: a minimum of seven impacts to the back of the head causing subgaleal hemorrhage, abrasions, lacerations and contusions. Three impacts to the face with a blunt object. There were patterned contusions of the chest, right buttock, and left thigh, which were consistent with four impacts with a long, thin rod shaped object. There were also contusions to the ankles.

Dr. Ripple would further testify that after examining the wooden dowel seized from the Defendant's living room that in her opinion, to a reasonable degree of medical certainty, the head, chest, thigh and butt injuries were all consistent with being struck by an object the size, weight and shape of the wooden dowel. It is also her opinion, to a reasonable degree of medical certainty, that all of the injuries were sustained by Tamie Browning while she was alive. She would further testify that the manner of death was homicide.

Ernie Lohman would qualify as an expert in fingerprint comparison and would testify that the latent palm print lifted from the blood stain on top of the trunk near the left rear fender of Tamie Browning's white Oldsmobile Cutlass is identical to the known rolled left palm print of Mr. Abend.

The State would have presented DNA evidence. Numerous items were tested using PCR/STR DNA testing. All proper procedures were used and guidelines followed. Lewis Maddox, PH.D., would qualify as an expert in DNA analysis. He would testify, to a reasonable degree of scientific certainty, to the following: The swab taken from the blood stain on the rear trunk of Tamie Browning's white Oldsmobile Cutlass matched Tamie Browning's DNA Profile. This swab was taken from the stain containing Mr. Abend's latent palm print.

The partially smoked Newport cigarette found in the ashtray of Laverne Browning's black Chevrolet Monte Carlo in Baltimore City matched the DNA profile of Kenneth Abend. Two swabs, one taken from the barrel and the other from the grip and frame of the .38 caliber Smith & Wesson revolver found in Laverne Browning's black Chevrolet Monte Carlo, matched the DNA profile of Tamie Browning. The jacket belonging to Kenneth Abend, which was seized from Hector Silva's home, had a stain on it matching Tamie Browning's DNA profile. The jeans and shoes worn by the Defendant and seized from him incident to his arrest in Baltimore City had stains on them matching Tamie Browning's

DNA profile. The right Adidas men's shoe seized from the Defendant's living room had stains on it that matched Tamie Browning's DNA profile. The eyeglass lens seized from the Defendant's living room floor by the door that leads upstairs and a piece of glass on the carpet in front of the same door both tested positive for human blood and matched the DNA profile of Laverne Browning.

A swab of the right shoe containing a red stain worn by Karen Colauer as she walked through the Defendant's residence on the day she and Nancy Chenowith visited Mr. Abend tested positive for blood and Tamie Browning's DNA profile could not be excluded as the source. The wooden dowel seized from Mr. Abend's living room tested positive for human blood and also had hairs adhered to it. A blood swab from this item matched Tamie Browning's DNA profile.

Mike Nichol would qualify as an expert in firearms and ballistics identification. He would testify, to a reasonable degree of scientific certainty, that the .38 caliber Smith & Wesson revolver found in Laverne Browning's Monte Carlo was test fired and found to be operable and capable of being fired. The cartridges were .38 special caliber cartridge cases bearing the federal cartridge company, Headstant. Examinations were conducted, test shots were fired from the seized .38 caliber handgun and microscopic comparisons were done.

The spent bullet recovered from the sliding glass door at the Defendant's residence, the spent bullet recovered from the bathroom floor in the Defendant's residence, the two spent bullets recovered from the body of Laverne Browning and the two spent bullets and spent bullet fragments recovered from the body of Tamie Browning were all fired from the .38 caliber Smith & Wesson revolver seized from Laverne Browning's black Chevrolet Monte Carlo. Mr. Nichol would also testify that no handgun other than the one he tested could have fired those bullets.

Eric Love would qualify as an expert in recovery analysis and comparison of footwear impressions. He would testify that numerous footwear impressions were examined that were taken from the concrete surface inside the screened-in porch, outside the sliding glass doors going to Defendant's residence. He would also testify, in his opinion to a reasonable degree of scientific certainty, that these footwear impressions were consistent in design and size with the men's Adidas shoes, size 10 ½, seized from the Defendant's living room.

Six different footwear impressions taken from the same concrete area were consistent in design and size with the Colorado Deck shoes, size 10 ½, that the Defendant was wearing when he was arrested. Inside the Defendant's residence, on the linoleum floor, were three footwear impressions consistent in design and size with the previously mentioned Adidas shoe, and two footwear impressions

that were found to be identical to the Colorado Deck shoes that the Defendant was wearing when he was arrested.

Exh. 2 at 28-45. In addition to the agreed statement of facts, the parties agreed to the admission of four exhibits: the autopsy report of Laverne Browning, the autopsy report of Tamie Browning, the .38 special Smith & Wesson revolver, and a photograph of the wooden dowel. Exh. 2 at 45-47.

After presentation of that evidence, the parties submitted written briefing on Defendant's Motion for Judgment of Acquittal. *See* Exh. 3. On November 3, 2004, the Court issued its ruling on the record, denying Defendant's Motion for Judgment of Acquittal and entering a guilty verdict on all counts. Exh. 4. After several additional motions hearings, the sentencing trial began on December 6, 2004 and lasted through December 14, 2004. On December 21, 2004, the Court sentenced Abend to two life sentences without parole, running consecutively, for the capital murder charges and a third life sentence without parole, running consecutively, for the sex offense, as well as twenty years, running consecutively, for the handgun offense. Exh. 15.

Abend filed a direct appeal of his convictions, and the judgments were affirmed by the Maryland Court of Special Appeals by an opinion issued on April 10, 2007. Exh. 18. Abend then filed a petition for post-conviction relief. A hearing was held on July 2, 2009, and the petition was denied via written opinion dated August 31, 2009. The application for leave to appeal to the Court of Special Appeals was denied on August 19, 2010, with a mandate issued September 20, 2010. The instant petition was timely filed on August 26, 2010.

## ANALYSIS

The amendments to 28 U.S.C. § 2254, enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), require this Court to limit its analysis to the law as it was

"clearly established" by precedent at the time of the state court's decision. Section 2254 provides:

> "(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

The "unreasonable application" prong of § 2254(d)(1) permits a federal habeas court to "grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts" of petitioner's case. *Williams v. Taylor,* 529 U.S. 362, 413 (2000); *see also Bell v. Cone,* 535 U.S. 685, 694 (2002). In other words, a federal court may grant relief when a state court has misapplied a "governing legal principle" to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade,* 538 U.S. 63, 76 (2003) (*citing Williams,* 529 U.S. at 407). To be "unreasonable," the state court's application of Supreme Court precedent must have been more than incorrect or erroneous. *See Lockyer,* 538 U.S. at 75. The state court's application must have been "objectively unreasonable." *See Williams v. Taylor,* 529 U.S. at 409, *see also Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003). That high standard has not been met in Abend's case. Each issue he raises is addressed sequentially below.

## I.    Closing Argument

Abend contends that he was denied his constitutionally required opportunity to make a closing argument at trial, because the judge proceeded to render her verdicts without offering his

attorneys the opportunity to make a closing argument in court. In addressing this issue, the state court considered three basic points. First, the state court noted that Abend's trial counsel did not object to the procedure when the verdicts were announced, therefore the issue was not properly preserved for appellate review. Exh. 18 at 16-17. Second, the state court noted that the trial judge's comments alerted counsel to the fact that she was about to render verdicts, when she announced, "[G]iven the fact that there will be no more evidence, I must make findings of guilty or not guilty as to each count." Exh. 18 at 16. At that point, counsel had an opportunity to request an opportunity to make a closing argument or to object to the fact that argument had not occurred. Those facts stand in contrast to *Covington v. State*, 282 Md. 540, 542-46 (1978), where the Court rendered verdicts without warning and counsel did not have the opportunity to request argument. Even in *Covington*, however, the majority of the Court of Appeals affirmed the conviction because counsel had not preserved the objection. The state court rejected Abend's urging to adopt the position taken by the dissent in *Covington*.

Finally, in Abend's case, the state court determined that argument had been adequately presented "by way of a lengthy written memorandum in support of the motion for judgment of acquittal." Exh. 18 at 17. The court noted that "in these pleadings appellant presented his arguments regarding the evidence pertaining to his guilt or innocence." Exh. 18 at 17. Abend has not pointed to any argument that would have been made in an in-court closing argument that was not made in the lengthy and well-written memorandum submitted on his behalf. Without any specific demonstration of prejudice, the state court's analysis that Abend was not deprived of his Sixth Amendment right to a closing argument cannot be deemed "objectively unreasonable."

II.    DNA Records

In his § 2254 petition, Abend's argument about DNA evidence consists of a single sentence, "Counsel's motion for the production of DNA analysis was overshadowed by the fact that agreeing to the statement of facts foreclosed any challenge to the authenticity of the DNA samples." Petition at 4. The State also does not address the DNA issue in its Answer to the Petition. However, a review of the record demonstrates that no habeas relief is warranted on this issue.

As the state court found, "In October 2002, the State provided the defense with the Cellmark case file, Cellmark's standard operating procedures, an article describing the PCR databases used by Cellmark in [Abend]'s case, and copies of current certificates, accreditations, licenses, and permits for Cellmark." Exh. 18 at 31-32. The requests in dispute pertained to the production of (1) documents relating to a particular DNA analyst, Ms. Blair, who did not work on Abend's case, and (2) other records relating to any misconduct of any DNA analysts at Cellmark. Because the requests were speculative and not relevant to Abend's case, and because the required relevant DNA records were produced in a timely fashion, the state court concluded that there had been no error. Exh. 18 at 31-32.

Moreover, the state court further concluded that even if the denial of additional DNA records had been erroneous, any error was harmless in light of the overwhelming non-DNA evidence against Abend. Specifically, the state court referred to evidence including but not limited to Tamie Browning's statement to her husband that she was going to Abend's apartment, the red splash seen on Abend's clothing the night the Brownings disappeared, the copious blood stains and cartridge casings found in Abend's apartment, the wooden dowel with blood and hair found in Abend's apartment, Abend's flight after the murders to Charles County and Baltimore City, his confession to his friend that he shot his landlord, and the fact that Abend's palm print

was found, in blood, on the hood of the trunk containing the two bodies. Exh. 18 at 32-33. The state court's analysis was squarely on point and cannot be described as objectively unreasonable.

### III.   Waiver of Jury Trial

Abend contends that his waiver of jury trial was not knowing and intelligent for two reasons: first, he did not understand that he and his attorney would participate in selecting the jurors via peremptory challenges; and second, he did not understand that the same burden of proof would apply in a non-jury trial, but believed that a lower burden of proof might apply. Finally, he contends that a heightened standard for waiver should apply in death-eligible cases.

The transcripts reflect that the trial court engaged in a lengthy colloquy with Abend about his right to jury trial before finding an knowing and intelligent waiver. Exh. 2 at 17-20. For his waiver to be valid, the court must be satisfied that there has been "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Neither Maryland law nor federal law requires that the colloquy to determine whether a jury trial waiver is voluntary contains any specific advisements. *See State v. Hall*, 321 Md. 178, 183 (1990) (rejecting challenge to jury trial waiver based on failure to inform the defendant that he could play a role in the selection of the jury); *Salzman v. State*, 49 Md. App. 25, 58-59 (1981) (rejecting challenge to jury trial waiver based on failure to explain to the defendant the State's burden of proof in a non-jury trial); *United States v. Boynes*, 515 F.3d 284, 287 (4th Cir. 2008) (citing *United States v. Hunt*, 41 F.2d 983 (4th Cir. 1969) for holding that neither Rule 23(a) nor the Sixth Amendment requires the district court to interrogate defendants as to the voluntariness of their waiver of a jury trial).

13

Moreover, the state court's determination that there is no heightened standard for waiver in death-eligible cases is not objectively unreasonable. Again, no state or federal court has used a standard more stringent than "knowing and voluntary waiver" in assessing the validity of a defendant's waiver. *See, e.g., Abeokuto v. State*, 391 Md. 289, 316-24 (2006) (applying the knowing and voluntary standard to a jury trial waiver in case where defendant was facing the death penalty if convicted).

## IV. Notices of Intent to Seek Enhanced Penalties

Abend contends that Md. Code (2002), §§ 2-202(a)(1)(i) and 2-203(1) of the Criminal Law Article required that he have written notice 30 days before trial of the State's intention to seek imprisonment for life without the possibility of parole. Specifically, Abend contends that the State provided notice in Case No. K-04-1903 on September 9, 2004, and proceeded to trial on September 22, 2004, which was less than 30 days after notice was provided. However, Abend was originally charged with the same crimes in two consolidated cases: Case Nos. K-02-286 and K-02-506. Written notice of intention to seek imprisonment for life was filed in those cases on May 24, 2002. At the court proceeding on September 9, 2004, the trial court remarked that a new indictment returned in K-04-1903 included allegations of principalship, a fact that had to be proven before capital punishment could be imposed. The trial court then consolidated Case No. K-04-1903 with Case No. K-02-506. The prosecutor specifically noted that the K-02-506 case would "tagalong" for administrative purposes. Exh. 17 at 29.

In considering Abend's notice argument, the state court found that written notice was timely provided to Abend, because he had received notice of the State's intent to seek enhanced penalties on May 24, 2002, more than two years before trial. Exh. 18 at 45-46. The fact that a new notice was provided on September 9, 2004 did not vitiate the prior notice that had been

14

provided in the subsequently consolidated case. The state court's analysis of the law and the facts of Abend's case was not objectively unreasonable.

Moreover, violations of state law which do not implicate specific federal constitutional protections are not actionable under § 2254. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Weeks v. Angelone*, 176 F.3d 249, 262 (4th Cir. 1999) ("when a petitioner's claim rests solely upon an interpretation of state case law and statutes, it is not cognizable on federal habeas review"). There is therefore no basis for federal habeas relief on this issue.

## V.    Ineffective Assistance of Counsel

Abend asserts that he received ineffective assistance of counsel in seven different ways. The two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs the standard for examining ineffective assistance claims. First, a petitioner must demonstrate that the performance of his counsel was deficient by falling below an objective standard of reasonableness. *Id.* Second, a petitioner must demonstrate that he suffered prejudice as a result of the defective performance. *Id.* The Supreme Court has made it clear that courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered a sound trial strategy." *Id.* at 689.

In the context of a § 2254 proceeding, it is not sufficient to convince the federal habeas court that the state court merely applied *Strickland* incorrectly. Rather, a petitioner must show that the state court applied *Strickland* to the facts in an objectively unreasonable manner. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

### 1.  Litigation of lack of criminal responsibility and/or an insanity defense

Abend contends that the decision to plead Not Guilty with an Agreed Statement of Facts prohibited him from using a defense of not criminally responsible ("NCR defense") or a defense of insanity. As the state court found, both defense counsel testified that they had consulted with many doctors and medical professionals specializing in those defenses, as well as with other attorneys experienced in cases involving defenses of NCR and insanity. Despite those extensive efforts, Abend's counsel were not able to find any doctors who would testify that Abend was not criminally responsible or was insane at the time he committed the crimes.

In that context, defense counsels' decision to proceed with a not guilty plea with an agreed statement of facts was a "sound trial strategy." The Supreme Court has made it clear that courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered a sound trial strategy." *Id.* at 689. The testimony of defense counsel, supported by the evidence, is that the use of the agreed statement of facts allowed extensive negotiation over the way certain evidence would be presented, and prevented some horrific and graphic facts and photographs from becoming part of the evidence at trial. Exh. 22 at 18-19, 36-37. Abend therefore has not met the burden, required by *Strickland*, to prove that the counsel's decision was unreasonable professional assistance or something other than sound trial strategy.

### 2. Use of Intoxication as Mitigation

Under Maryland law, voluntary intoxication, in certain circumstances, can mitigate the *mens rea* elements of specific intent crimes. *See Bryant v. State*, 83 Md. App. 237, 248 (1990). Abend claims that his attorneys were ineffective because they did not raise an intoxication defense.

16

The evidence at the hearing conducted in state court, however, clearly demonstrated that the attorneys thoroughly explored the possibility of raising an intoxication defense, including consultation with multiple physicians to serve as expert witnesses. Exh. 22 at 13. No doctor was willing to testify that intoxication caused Abend to be so impaired that he lacked the necessary *mens rea* to commit first-degree murder. Exh. 22 at 14-15, 23-26. Moreover, even without having been able to procure expert testimony, defense counsel did argue at trial, in Defendant's Motion for Judgment of Acquittal, that the state failed to prove beyond a reasonable doubt that intoxication did not prevent the defendant from acting with specific intent. Exhibit 3 at 16-18. The Court expressly considered and rejected that argument in its ruling on the motion for judgment of acquittal. Exhibit 4 at 10-12. Counsels' efforts in exploring expert testimony and using the intoxication defense were within the parameters of reasonable professional assistance.

### 3. Failure to use charts prepared for mitigation case

Abend contends that a significant number of visual aids were prepared and not used at his sentencing. At the hearing in state court, one of the attorneys, Ms. McCabe, testified that the charts were in fact used at sentencing. Exh. 22 at 49-50. Abend has not been able to demonstrate that any decision with respect to the charts was prejudicial to his defense. Defense counsel made an extensive presentation at the sentencing trial, which lasted more than five (5) days. The end result was favorable to Abend in that he did not receive a death sentence, and there is no evidence that the use of any charts would have resulted in any lesser sentence.

It appears from Abend's testimony at the post-conviction hearing that his concern was less about whether charts were used and more about the fact that Mr. Trainor did not make a closing argument before the judge rendered guilty verdicts. Exh. 22 at 68-69. The issue

regarding the closing argument was addressed on direct appeal, see Section I above, and was not raised post-conviction as an ineffective assistance argument.

### 4. Conflicts of interest by Mr. Trainor and investigator

Two of Abend's contentions relate to alleged conflicts of interest: First, Abend contends that a conflict arose because one of his counsel, Mr. Trainor, previously represented an individual, "Big Frank" Nichter, who had violently assaulted Abend and caused him significant injury prior to the murders. Second, Abend contends that one of the investigators hired by the defense team had dated Nichter many years ago, and that a conflict was created.

While Abend clearly has an adversarial relationship with Nichter, Nichter's role in this proceeding was tangential at most. The defense argued that Abend suffered from lasting trauma from his beating by Nichter that affected his mental state at the time of the charged crimes, which provided Abend with a mitigation argument at sentencing. Defense counsel presented the relevant information at sentencing via the testimony of the officer who arrived at the scene of the assault on Abend, and by expert witnesses such as Dr. Blumberg to discuss the effects of the assault on Abend's mental state. Nichter was not a witness at trial or sentencing, nor would his testimony have assisted the defense in presenting their argument.

The state court's analysis of this issue under *Strickland* cannot be deemed objectively unreasonable, and in fact appears entirely correct. As the state court noted, it appears that no actual conflict of interest was presented by Mr. Trainor's prior representation of Nichter on unrelated charges. Even if an actual conflict of interest had been created, Nichter would have had to waive the conflict if privileged information gleaned from the representation of Nichter were to be used against Nichter. Nichter had no direct participation in Abend's proceedings in any way, and certainly no exposure to any civil or criminal liability. Any additional information

18

Mr. Trainor had about Nichter from his prior representation, then, only could have inured to Abend's benefit.

Similarly, the evidence at the hearing was that an investigator hired by defense counsel happened to have had a personal relationship with Nichter many years ago, beginning in high school. She had no contact with Nichter for ten years prior to her testimony in Abend's case. Because of her prior history with Nichter, the investigator was able to testify about his involvement with body-building, because she had personally attended body-building events with Nichter. Exh. 22 at 39. That testimony helped to bolster Abend's argument that Nichter's assault on him was exceptionally severe. Exh. 9 at 403-411. Abend presented no specific evidence as to how the investigator's prior relationship with Nichter would have affected her work on his case in a negative way. In fact, Mr. Trainor testified that the investigator's prior relationship with Nichter provided a "substantial benefit" to Abend. Exh. 22 at 39. For these reasons, the state court's conclusion that no conflict of interest resulted in ineffective assistance was reasonable.

### 5. Continuances in the Case

Abend contends that there were significant delays and continuances in his case. When asked during his testimony, however, he was unable to articulate any way in which the continuances hurt him. Exh. 22 at 70. As a result, Abend cannot meet the *Strickland* requirement of demonstrating prejudice.

### 6. Cumulative effect of errors

Per the analysis above, when each individual alleged error is considered, no constitutional errors were committed by counsel. Acts or omissions "that are not unconstitutional individually

cannot be added together to create a constitutional violation." *Fisher v. Angelone*, 163 F.3d 835, 852-53 (4th Cir. 1998).

### Conclusion

A certificate of appealability shall not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2000). A petitioner satisfies this standard by demonstrating that reasonable jurists would find that an assessment of the constitutional claims is debatable and that any dispositive procedural ruling dismissing such claims is likewise debatable. *Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003); *Rose v. Lee*, 252 F.3d 676, 683-84 (4th Cir. 2001). Because reasonable jurists would not find Petitioner's claims debatable, a certificate of appealability is DENIED.

For the reasons stated herein, Abend's Petition for Writ of Habeas Corpus is DENIED. A separate Order follows.


Dated: <u>August   , 2011</u>

                                  _____
                                    RICHARD D. BENNETT
                                    UNITED STATES DISTRICT JUDGE